843 F.2d 1390
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Virgil BOGLE, Plaintiff-Appellee,
v.
CONSOLIDATED FREIGHTWAYS CORPORATION OF DELAWARE, Defendant-Appellant.
 Nos. 87-5437, 87-5666.
 United States Court of Appeals, Sixth Circuit.
 March 31, 1988.
 
 Before RALPH B. GUY, Jr., and BOGGS, Circuit Judges, and JOHN W. PECK, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Plaintiff, Virgil Bogle, filed a "hybrid Sec. 301" claim pursuant to section 301 of the Labor Management Relations Act, 29 U.S.C. Sec. 185, seeking reinstatement to his former job as truck driver of defendant, Consolidated Freightways Corporation of Delaware (the Company). Plaintiff alleged that he was discharged in violation of the collective bargaining agreement and that his Union, Teamsters Freight Employees Local 480 (the Union), had breached its duty of fair representation by failing to properly present his claim to the Grievance Committee. The Union was initially named as a defendant in the suit but was voluntarily dismissed by the plaintiff prior to trial.[1] After both parties had presented their evidence, the district judge issued a ruling from the bench in which he found that the Union had breached its duty by failing to interview a key witness and by presenting plaintiff's grievance to the Committee in a perfunctory manner. The judge went on to rule that plaintiff's discharge violated the collective bargaining agreement and ordered plaintiff's reinstatement to his former position. This order was stayed pending appeal to this court.
 
 
 2
 Upon review of the entire record, we find as a matter of law that the Union's conduct in processing plaintiff's grievance did not amount to the type of arbitrary, discriminatory, or bad faith conduct necessary to establish a breach of the duty of fair representation on the part of the Union. Accordingly, the judgment of the district court is reversed.
 
 I.
 
 3
 On June 10, 1985, plaintiff was dispatched to drop off a trailer at a Service Merchandise warehouse facility in Nashville, Tennessee. After arriving at the warehouse, plaintiff backed his trailer up to the building, uncoupled the trailer, and drove away. Plaintiff picked up another trailer at Service Merchandise and returned to the Consolidated Freightways terminal. After plaintiff had left, a Service Merchandise employee noticed that the trailer had been backed into a downspout which ran down the side of the building. The employee informed his supervisor that the downspout had been creased and the supervisor in turn called Consolidated Freightways to complain about the damage.
 
 
 4
 When plaintiff returned to the terminal, he reported to his supervisor, Mr. Hastings, who was on the telephone with the Service Merchandise supervisor. When confronted by his supervisor, plaintiff said he did not think that he had hit anything, and that if he did hit the downspout, he did not realize it at the time. Plaintiff admitted to Mr. Hastings that he had not checked the rear of the trailer before leaving Service Merchandise. Plaintiff claims that he offered to fill out a damage report, but Hastings told him that it would not be necessary.
 
 
 5
 The Company investigated the incident and confirmed that the trailer had been assigned to the plaintiff and that the accident had resulted in some type of damage to the downspout. The Company investigator took a picture of the trailer resting against the downspout. The record does not contain a detailed description of the damage but the Company investigator testified that it was in excess of $150. The Company also received a report from Service Merchandise stating that a careless Consolidated Freightways driver had damaged Service Merchandise property. Based on this information, the Company's assistant terminal manager, Jim Pawlowski, decided to discharge plaintiff pursuant to Article 46 of the collective bargaining agreement which provides for immediate discharge without notice for failure to report an accident.
 
 
 6
 After receiving his letter of dismissal, plaintiff filed a grievance with the Union. In the initial draft of his grievance, plaintiff stated that he did not know whether or not he had hit the downspout. The Union business agent, Joe Francis, advised plaintiff to revise his grievance and flatly deny that he had backed into the downspout. After helping plaintiff complete the grievance form, Mr. Francis went to Service Merchandise to investigate the incident. Francis inspected the downspout and found "very little damage." Mr. Francis spoke to one of the Service Merchandise employees and asked him to call Consolidated on plaintiff's behalf and urge that he be reinstated. Mr. Francis also asked one of the Service Merchandise drivers whether he or any other driver had moved plaintiff's trailer or had backed it into the downspout. The driver said that he had not moved the trailer nor had he seen anyone else move it.
 
 
 7
 Mr. Francis then went to the Consolidated terminal to talk with Mr. Pawlowski. Mr. Francis told Pawlowski that he did not think that plaintiff had hit the downspout and suggested that the damage might have been caused by one of the "switchers" who drove for Service Merchandise. Mr. Pawlowski refused to reinstate the plaintiff. On at least two other occasions, Mr. Francis returned to Consolidated and "pleaded" with the Company to reinstate the plaintiff. Francis argued that plaintiff had a good work record and that the damage was minimal. Nevertheless, Pawlowski was adamant and said that he would leave it up to the Grievance Committee.
 
 
 8
 Under standard Union procedure, business agent Frank Hopkins was assigned to present grievances to the Grievance Committee. The Southern Multi-State Grievance Committee consists of a six-person panel made up of three management representatives and three labor representatives. The Committee acts as the first arbiter of grievances filed under the collective bargaining agreement. Francis briefed Hopkins on the results of his investigation and told him that he did not think that plaintiff had hit the downspout. Plaintiff met with Francis and Hopkins three days before the Committee hearing. They discussed the plaintiff's grievance for three or four minutes until Hopkins was interrupted by a telephone call. Hopkins instructed plaintiff and Francis to go back to Consolidated and request reinstatement one more time. Plaintiff and Francis followed this advice, but were unsuccessful in their efforts.
 
 
 9
 The hearing was held before the Committee on July 22, 1985, in Biloxi, Mississippi. The Union paid for plaintiff to travel to Biloxi to attend the hearing. The Company's case consisted of the discharge letter, the written complaint of Service Merchandise to Consolidated Freightways regarding the incident, a photograph of plaintiff's trailer parked against the downspout, and a trip sheet which identified the plaintiff as the driver of the trailer involved in the accident.
 
 
 10
 Hopkins presented plaintiff's case on behalf of Local 480. Hopkins first read plaintiff's grievance to the Committee. He also argued that because Service Merchandise had "switchers" who moved trailers around the lot, it was impossible to know whether plaintiff or one of Service Merchandise's own switchers had hit the downspout. Hopkins then introduced plaintiff to the Committee and told him to tell the Committee "exactly what happened on this particular day."
 
 
 11
 Plaintiff told the Committee that "everything is exactly as he [Hopkins] said. I'd like to say I don't think I hit it. If I did, I didn't know it." One of the Committee members then asked plaintiff if he had offered to fill out an accident report, and plaintiff replied that after Service Merchandise called Consolidated Freightways, he had offered to fill out a report, but that Hastings had told him he would take care of it.
 
 
 12
 The Company then argued to the Committee that plaintiff was "trying to switch the blame around" and that he could not have done the damage and not been aware of it. Hopkins replied by restating his argument that Service Merchandise often switched trailers around and put them at their dock. When plaintiff was asked if he had anything more to say, he offered an argument that there was a possibility that someone else could have bumped his trailer with another vehicle and knocked it into the building after he had dropped it off because there was not enough room to turn a forty-five foot trailer around. After hearing the arguments of both parties, the Grievance Committee ruled in the Company's favor and upheld plaintiff's dismissal.
 
 
 13
 Plaintiff filed the instant suit in federal court on September 23, 1985. A bench trial was conducted on March 16, 1987. The transcripts in the record show that the trial judge took an active role in questioning the witnesses and was particularly troubled by the plaintiff's claim that he had been told by his supervisor, Mr. Hastings, not to file an accident report. At trial, Mr. Hastings testified that he was unable to remember whether or not plaintiff had offered to file a report.
 
 
 14
 In an oral opinion, the district judge stated, "The court finds the Union investigation and presentation of this grievance was so perfunctory as to seriously undermine the arbitral process." Specifically, the court cited the Union's failure to interview Mr. Hastings who could have confirmed plaintiff's claim that he had offered to fill out a report. The court also observed that Mr. Hopkins's presentation of plaintiff's grievance to the Committee "was not even half-hearted." The court went on to conclude that the firing was unjustified and would have been overturned by the Grievance Committee if the Union had properly represented the plaintiff. Accordingly, the court ruled that plaintiff should be reinstated the next day with back pay. The Company's motion to stay the order pending appeal was granted.
 
 II.
 
 15
 As a general rule, a court should defer to an arbitrator's decision resolving an employee grievance in cases where the collective bargaining agreement provides for final binding arbitration. See Hines v. Anchor Motor Freight, Inc., 424 U.S. 554, 562-63 (1976). This deference should also be accorded to the decisions of a joint labor management panel such as the Southern Multi-State Grievance Committee. See Stevens v. Highway, City & Air Freight Drivers, 794 F.2d 376, 377-78 (8th Cir.1986). A recognized exception to this general rule applies in cases where the grievance resolution process has been "seriously flawed by the Union's breach of its duty to represent employees honestly and in good faith without invidious discrimination or arbitrary conduct." Hines, 424 U.S. at 570. In other words, in order for a discharged employee to sue the employer for breach of contract, the plaintiff must first establish that the Union's failure to properly represent him, "seriously undermined the integrity of the arbitral process." Ruzicka v. General Motors, Corp., 649 F.2d 1207, 1213 (6th Cir.1981) (Ruzicka II ), cert. denied, 464 U.S. 982 (1983).
 
 
 16
 In the instant case, plaintiff has not alleged that the Union discriminated against him or acted in bad faith. Therefore, the only question is whether the Union acted in an "arbitrary" manner in processing the plaintiff's grievance. This court has held that a gross mistake or inaction on the part of the union which has no rational explanation may constitute a breach of the duty of fair representation. See Williams v. Teamsters Local Union, No. 984, 625 F.2d 138 (6th Cir.1980) (per curiam) (union's conduct had to be arbitrary because there was no rational explanation for its failure to process the employee's grievance); cf. Balowski v. International Union, UAW, AFL-CIO, 372 F.2d 829, 834 (6th Cir.1967) (gross mistake or inaction implies bad faith). It is well established, however, that mere negligence or mistaken judgment, without more, is not sufficient to establish a breach of the duty of fair representation. Poole v. Budd Co., 706 F.2d 181, 183 (6th Cir.1983).
 
 
 17
 Based on our review of the record, we find that the Union adopted a strategy in pursuing plaintiff's grievance which later proved to be unsuccessful. Its conduct, however, cannot be correctly characterized as grossly negligent, arbitrary, or perfunctory so as to amount to a breach of its duty of fair representation.
 
 
 18
 Initially, plaintiff had two lines of argument available in his defense. He could either claim that he did not back into the downspout and thereby deny any responsibility for the damage; or he could admit liability for the accident, but argue that he was excused from his duty to report it based on his claim that Mr. Hastings told him not to file a report. The Union business agent, Joe Francis, decided that the first argument would be more effective and he instructed the plaintiff to revise his grievance accordingly. This decision was not entirely irrational or without justification. First, plaintiff had previously stated that he did not think he had hit anything. If plaintiff subsequently admitted responsibility for causing the damage, he may still have been subject to disciplinary action even if he were excused from failing to report the accident. Under the approach adopted by the Union, plaintiff had a chance of regaining his job without the accident being included in his work record. Moreover, under Article 46 of the collective bargaining agreement an employee is subject to immediate discharge for the "failure to report an accident." Thus, the Company could argue that plaintiff knew or should have known that he had hit the downspout and, therefore, he should have reported the accident immediately. In fact, the record reveals that the Company attorney did make a similar argument before the Grievance Committee. The Union may have anticipated this argument and decided that plaintiff would be better off denying that he caused the damage, thereby relieving him of any responsibility for reporting the accident. Third, the Union representative may have doubted the credibility of plaintiff's claim that Mr. Hastings had told him not to report the accident. Thus, the Union may have made a conscious decision not to interview Mr. Hastings for fear that he would repudiate plaintiff's story. In addition, the Union may have sought to minimize the risk of creating a factual dispute at the hearing which would shift the focus to the issue of plaintiff's credibility and away from this exemplary work record and the trivial nature of the incident. In any event, even if the failure to interview Hastings was inadvertant, it was not a gross error since plaintiff had an alternative theory of defense which did not depend on Hastings as a witness.
 
 
 19
 Having adopted an initial strategy, the Union adequately pursued plaintiff's grievance. Mr. Francis went to the Service Merchandise facility and inspected the damage to the downspout. He questioned employees there to determine if any of the drivers had moved the trailer after plaintiff had left. He also urged one of the Service Merchandise workers to call Consolidated Freightways on plaintiff's behalf. The record also reveals that Mr. Francis approached the Consolidated Freightways management representative on at least three different occasions requesting that plaintiff be reinstated. Apparently, the pre-hearing meeting between Mr. Francis, Mr. Hopkins, and plaintiff was interrupted by a telephone call. Nevertheless, this fact in and of itself is hardly sufficient to establish a breach of the duty of fair representation.
 
 
 20
 We also find that Mr. Hopkins's presentation of plaintiff's grievance to the Committee was not so inadequate as to amount to a breach of the duty of fair representation. The district judge characterized Hopkins' performance as less than "half-hearted" and was especially critical of his failure to emphasize plaintiff's claim that he had been told not to file an accident report. First, we have already hypothesized several logical reasons why the Union would not want to rely on this argument. Second, the argument favored by the district court is essentially based on a theory of equitable estoppel, i.e., the Company was estopped from relying on plaintiff's failure to report the accident as a justification for his discharge where a management representative had expressly rejected the plaintiff's offer to file a report. The district court concluded that "[t]his statement by Mr. Hastings was binding on the company and would have been a complete defense to the discharge for failure to report an accident." While the strength of this argument might have been obvious to someone with the extensive legal experience of the trial judge, it might not have been so apparent to a union representative. Thus, although the Union may not have chosen the best litigation strategy, this error merely reflects a lack of judgment and not arbitrary or irrational misconduct. See generally Poole v. Budd Co., 706 F.2d at 185 ("Union representatives are not to be strictly held to the standards of attorneys."). See also, Stevens v. Highway, City & Air Freight Drivers, 794 F.2d 376, 378 (8th Cir.1986) ("[T]o hold all union representatives to the demanding tests applied to a trained trial lawyer would defeat the aims of informality and speedy resolution contemplated by labor-management grievance agreements.") (quoting Findley v. Jones Motor Freight, Inc., 639 F.2d 953, 958 (3d Cir.1981)). Thus, we find that the Union's decision to emphasize one plausible argument in place of another, albeit potentially more effective argument, does not amount to a breach of the duty of fair representation.
 
 
 21
 In addition, the record reveals that the plaintiff did, in fact, present his claim to the Grievance Committee that he had been told not to file an accident report. Mr. Hopkins read plaintiff's grievance to the Committee including the following statement, "I asked Carl Hastings if he wanted me to fill out an accident report. Carl Hastings said he would take care of it. Since ______ [sic] said I did not need an accident report, I feel I should be put back to work with pay for lost time and fringe benefits." (Omission in record). One of the Committee members specifically questioned the plaintiff about this point and the plaintiff repeated his allegation that Hastings "said he would take care of it." Therefore, we find that the Union adequately presented both of plaintiff's arguments to the Committee and did not breach its duty of fair representation.
 
 
 22
 We share the concern of the district court that the plaintiff here has been discharged over a seemingly trivial incident. Nevertheless, the resolution of plaintiff's grievance is left to the procedures established by the collective bargaining process. We find that the Union's representation of the plaintiff was not arbitrary, discriminatory, or in bad faith; therefore, the district court was bound to defer to the decision of the Grievance Committee.
 
 
 23
 For the foregoing reasons, the judgment of the district court is REVERSED.
 
 
 
 [1]
 The Union is not an indispensible party to a hybrid section 301 action. See Ruzicka v. General Motors Corp., 649 F.2d 1207, 1213 n. 4 (6th Cir.1981) (Ruzicka II ), cert. denied, 464 U.S. 982 (1983)
 The record does not indicate whether there were any internal grievance procedures through which plaintiff could have appealed his claim that the Union did not properly represent him before the Grievance Committee. We note that, in cases where such intra-union remedies are available, the failure to exhaust the internal union grievance procedure would bar plaintiff from filing a hybrid section 301 claim in federal court. See, e.g., Monroe v. Int'l Union, UAW, 723 F.2d 22, 24 (6th Cir.1983). The Company, however, has not raised this defense in the instant case.